UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA,

        -against-                                S1 04 Crim. 0070 (LAK)

SALVATORE SCALA and THOMAS SASSANO,

        Defendants.
------------------------------------- x

**MEMORANDUM OPINION**

      Appearances:

             Joon H. Kim
             Christopher P. Conniff
             OFFICE OF THE UNITED STATES ATTORNEY
             FOR THE SOUTHERN DISTRICT OF NEW YORK
             *Attorneys for the United States*

             Bruce A. Barket
             THE LAW OFFICES OF BRUCE A. BARKET, P.C.
             *Attorneys for Defendant Salvatore Scala*

             Ronald Rubenstein
             RUBENSTEIN & COROZZO, LLP
             *Attorneys for Defendant Thomas Sassano*

LEWIS A. KAPLAN, *District Judge.*

      Defendant Salvatore Scala, who stands indicted for extortion, conspiracy to commit extortion, and federal income tax evasion, moves to dismiss Counts One through Five of the indictment on the ground that the government's delay in bringing the indictment substantially has

prejudiced his ability to present his defense.[1] In the alternative, he requests a "due process hearing" to explore the reasons behind the delay in bringing the indictment.

Thomas Sassano, who was indicted for extortion and conspiracy to commit extortion, moves to suppress evidence obtained through electronic surveillance on the grounds that the applications for authorization to conduct the surveillance failed to state probable cause and failed to support a finding that other investigative procedures had been tried and failed. He moves also for a *Franks* hearing based on his allegation that the applications contained materially false and misleading omissions.

## I.  Scala's Motion

### A.  Facts

On June 20, 2000, Scala was arrested on racketeering and extortion charges filed in the Eastern District of New York. After a jury trial, he was convicted on May 22, 2001 of conspiring to extort Cherry's Video, an adult entertainment club on Long Island. He was sentenced on November 2, 2001 to a term of sixty-three months' imprisonment, which he now is serving.

On January 26, 2004, the government presented evidence of Scala's extortion of a Manhattan business, the V.I.P. Club, to a grand jury sitting in the Southern District of New York. The grand jury indicted Scala that same day, but that initial indictment was filed under seal. After continuing its investigation, the government presented additional evidence to the grand jury, which

---

[1] Count One of the indictment charges Scala and Sassano with conspiracy to commit extortion, Count Two charges Scala and Sassano with extortion, and Counts Three through Six charge Scala with federal income tax evasion.

then returned the current six count superseding indictment against Scala on March 23, 2005.

According to Scala, the V.I.P. Club's operations were overseen by two men: Frank Marchello, the club's owner and manager, and John Vargo, both of whom were involved in the club's day-to-day business and thus would have been aware of any extortion of the club by Scala. Mr. Marchello died of cancer on January 31, 2002, after Scala was sentenced for the Cherry's Video extortion conspiracy, but before he was charged by either the initial or superseding V.I.P. Club indictment. Mr. Vargo died approximately seven months ago, before Scala was charged by the superseding V.I.P. Club indictment.

B. *Discussion*

Scala argues that the government's delay in bringing the indictment violated his right to due process in two ways. He claims that he has lost the ability to present exculpatory evidence relating to Counts One and Two due to the deaths of Messrs. Marchello and Vargo. He argues also that had the V.I.P. Club indictment been brought against him at the same time as the Cherry's Video indictment, he would have received lesser and/or concurrent sentences in the event of conviction on both. This, he argues, prejudices him with respect to Counts One through Five.

As the Supreme Court has stated, the statute of limitations is "'the primary guarantee against bringing overly stale criminal charges.'"[2] Accordingly, criminal prosecutions brought within the statute of limitations have a "strong presumption of validity" and are "only rarely dismissed."[3]

---

[2] *United States v. Marion*, 404 U.S. 307, 322 (1971) (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966)).

[3] *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999).

However, a timely indictment may violate a defendant's right to due process if pre-indictment delay has caused "'substantial prejudice' to the defendant's ability to present [a] defense and 'the delay was an intentional device to gain [a] tactical advantage over the accused.'"[4] The defendant bears the "'heavy burden' of proving both that [he or she] suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose."[5]

　　　*1.　Actual Prejudice*

Scala has failed to demonstrate actual prejudice to his ability to present his defense. He broadly states that Messrs. Marchello and Vargo would have exculpated him entirely on Counts One and Two. But the only support offered for that claim is assertions in Scala's memoranda of law as to the beliefs of two unnamed individuals of the attitudes of Messrs. Marchello and Vargo toward Scala.[6]

---

[4] *Id.* (quoting *Marion*, 404 U.S. at 324); *see also United States v. Lovasco*, 431 U.S. 783, 795 (1977) (improperly motivated prejudicial delay violates the Due Process Clause).

[5] *Cornielle*, 171 F.3d at 752 (emphasis in original); *see also, e.g., United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987), *cert. denied*, 484 U.S. 1035 (1988).

[6] The first assertion is that:

> "In fact, counsel for Mr. Scala has spoken to one witness who was employed at the club for the time period relevant who states that based on his conversations with Mr. Marchello he is 'certain' that Mr. Marchello, if he was alive, would testify that Mr. Scala was his friend and [what] Mr. Scala did was not extorting money [from] him or the club." Scala's Mem. at 11.

The second is that:

Proof of actual prejudice must be definite and specific.[7] Counsel's unsworn assertions as to vague generalities that allegedly lead unnamed persons to speculate that Messrs. Marchello and Vargo, if alive, would give testimony helpful to Scala do not show that Scala's ability to present a defense has been substantially and actually prejudiced.

At oral argument, Scala was given a second chance to submit affidavits from these anonymous witnesses as to their recollections of Messrs. Marchello and Vargo and their predictions of how the deceased club managers would have testified. However, Scala again declined to submit affidavits from either the witnesses or counsel.[8] Accordingly, there is no evidence before the Court as to what Messrs. Marchello and Vargo would have testified, much less specific evidence of how losing that testimony has caused Scala actual prejudice. "Were the mere assertion that another person is making a contention as to materiality sufficient to establish the materiality of [unavailable evidence], the requirement of proof of actual prejudice would be a nullity."[9]

---

"According to a witness interviewed by counsel Mr. Scala enjoyed a relaxed, casually friendly relationship with Mr. Marchello, and Mr. [Vargo] who neither [*sic*] evinced so much as discomfort in his presence, let alone the fear or resentment one would expect of a man who is being frightened into paying extortion fees." *Id*.

[7]

*See United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982); *United States v. Gotti*, 2004 WL 32858, *3-*4 (S.D.N.Y. Jan. 6, 2004) (rejecting claim of actual prejudice due to unavailable witnesses: "Moving Defendants speculate that if [the unavailable witnesses] were to testify, they would provide exculpatory testimony. However, Moving Defendants do not provide any details as to how the witnesses would exculpate them and therefore do not offer any particularity as to how they have been prejudiced."); *Beverly v. Walker*, 899 F. Supp. 900, 910 (N.D.N.Y. 1995), *aff'd*, 188 F.3d 900 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997) (noting defendant "must reveal [] the substance of the missing testimony").

[8]

*See generally* Scala Reply.

[9]

*United States v. Ungar*, 648 F. Supp. 1329, 1334 (E.D.N.Y. 1986).

Scala's argument that he has been prejudiced with respect to sentencing also is without merit. Pre-indictment delay may violate a defendant's right to due process where it causes substantial prejudice "to the defendant's ability to present [a] defense,"[10] but there is no basis for concluding that the loss of an opportunity for a concurrent sentence implicates constitutional concerns.[11] Moreover, the alleged prejudice again is too speculative. The conduct alleged in the V.I.P. Club indictment is distinct from the Cherry's Video extortion conspiracy and is alleged to have continued after Scala was convicted of that conspiracy, decreasing the likelihood that a concurrent sentence would have been imposed in a hypothetical earlier V.I.P. Club conviction. "It is impossible to describe [such a] claim of prejudice as 'definite and not speculative.'"[12] Accordingly, Scala has not shown the pre-indictment delay has caused him actual prejudice. This failure alone is fatal to his motion to dismiss.

2. *Improper Government Purpose*

Even had Scala shown actual prejudice, he has not demonstrated that the pre-

---

[10] *Cornielle*, 171 F.3d at 751-52; *see also Marion*, 404 U.S. at 324.

[11] *United States v. Luguis*, 166 F. Supp.2d 776, 780 (S.D.N.Y. 2001) ("The only prejudice identified by defendant is the loss of a possible opportunity to serve part of any sentence received in this case concurrently . . . Defendant does not claim this lost opportunity affected his ability to present his defense."); *see also United States v. Collazo*, 2004 WL 2997843, *3 (S.D.N.Y. Dec. 22, 2004).

[12] *United States v. Schorr*, 1997 WL 598444, *2 (S.D.N.Y. Sept. 25, 1997) (quoting *Birney*, 686 F.2d at 106).

indictment delay "was a course intentionally pursued by the government for an improper purpose,"[13] or an "intentional device to gain [a] tactical advantage over"[14] him.

Scala asserts that the V.I.P. Club extortion underlying Counts One and Two is alleged to have begun long before he became the subject of government scrutiny that resulted in the Cherry's Video charges. Accordingly, he argues, the government must have been aware of the alleged V.I.P. Club extortion activity during its earlier investigation and prosecution, and therefore must intentionally have delayed filing the current indictment in order to "'keep a card up its sleeve' in the event of an unsuccessful outcome" to the Cherry's Video prosecution.[15]

Scala provides no facts on which to base this conclusion, only speculation as to the government's motives.[16] Such reliance on "'an unavoidable deduction' of deliberate delay" does not suffice,[17] particularly where, as here, the government has responded with a specific rebuttal describing the reasons for the length of its investigation.[18] "[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's

---

[13] *Cornielle*, 171 F.3d at 752.

[14] *Marion*, 404 U.S. at 324.

[15] Scala Mem. at 24.

[16] *See Gotti*, 2004 WL 32858, *3 ("Moving Defendants fail to convince the Court that the Government did not seek to indict them immediately after the murder because somehow the Government knew [a witness would become unavailable].").

[17] *Scarpa*, 913 F.2d at 1014.

[18] *See* Conrad Decl. (describing the government's investigation of the V.I.P. club extortion).

judgment as to when to seek an indictment."[19]  Accordingly, Scala's speculation as to government motives is insufficient to show that the government had an improper purpose in delaying the V.I.P. Club indictment or, for that matter, to warrant a hearing.

Scala's motion is denied.

## II. Sassano's Motion

In an order dated April 19, 2002, the Supreme Court of the State of New York authorized, for thirty days, the interception of communications on a cellular telephone used by Sassano. The state court renewed this order for another thirty days on May 20, 2002, and expanded the order to include Sassano's home telephone and conversations inside his car. Sassano moves to suppress the conversations intercepted under these orders on a variety of grounds.

### A. *Alleged Lack of Probable Cause – Initial Application*

Sassano seeks to suppress first on the ground that there was no probable cause for the issuance of the initial order.

As an initial matter, the state court's determination that probable cause existed for the interceptions is entitled to substantial deference.[20] Sassano's argument must be rejected, therefore, if the state court had a substantial basis for its finding of probable cause. Moreover, any

---

[19] *Lovasco*, 431 U.S. at 790.

[20] *See, e.g., United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) ("[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists.").

doubt about the existence of probable cause must be resolved against the challenge.[21]

Probable cause is not a particularly demanding standard. "It is clear that '[o]nly the probability, and not the prima facie showing, of criminal activity is the standard of probable cause.'"[22] In considering the proof presented by the government, the court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."[23] Thus, the government's affidavits in support of probable cause "must be read as a whole, and construed in a realistic and common-sense manner, so that [their] purpose is not frustrated."[24]

Sassano attempts to break the affidavit down into insignificant pieces, arguing that the state court's finding of probable cause was influenced improperly by the "snowball effect" of the government's presentation.[25] But this approach ignores the admonition of cases such as *Ruggiero* and *Gates* that a court must look at the government's support for probable cause as a whole. In other words, a court must look at the snowball, not the individual snowflakes.

The affidavits clearly provided an ample basis for the finding of probable cause. The

---

[21] *See Illinois v. Gates*, 462 U.S. 213, 237 n.10 (1983).

[22] *Id*. at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

[23] *Id*. at 238.

[24] *United States v. Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (citing *United States v. Harris*, 403 U.S. 573, 577-79 (1971)).

[25] Sassano Mem. at 19.

government's initial application was based upon the detailed affidavit of Joseph Rauchet, Deputy Chief Investigator of the Organized Crime Task Force of the New York State Attorney General's Office (the "OCTF"). The evidence of probable cause was substantial. Three reliable confidential informants provided information based upon personal knowledge that Sassano was engaging in gambling and loansharking activities and that he used his cellular telephone in furtherance of those activities. For example, one informant stated he or she had overheard Sassano engaging in loansharking conversations over the cellular telephone. Another told the F.B.I. that Sassano managed a large-scale illegal betting operation, overseen on a day-to-day basis by known bookmakers and dependent on numerous other individuals to collect gambling and loansharking debts. Observation by law enforcement agents confirmed that Sassano repeatedly interacted with known bookmakers and organized crime members at various locations, including while walking outside. Rauchet's affidavit established also that Sassano used the cellular telephone to contact individuals involved in illegal gambling and loansharking activity as well as members of the Gambino crime family. The affidavit contained an extensive analysis of the cellular telephone records, describing numerous calls over five months to organized crime figures.

This evidence, taken as a whole, constituted a strong showing that Sassano probably had used, and would continue to use, the cellular telephone to discuss the various criminal activities described in the government's application.

B.  *Alleged Lack of Probable Cause – First Renewal*

Sassano challenges also the state court's renewal order, which authorized the continued interception of conversations over the cellular telephone as well as the interception of

conversations over Sassano's home telephone and inside his car. Sassano again attempts to discount individual pieces of the government's presentation and argues that the much of the evidence has an alternative, innocent explanation.

The government's presentation for the renewal authorization again included an extensive, detailed affidavit of Rauchet, which incorporated all the information in the prior version while adding details from a number of intercepted conversations from the cellular telephone. The intercepted conversations frequently were conducted partially in code, and some indicated that Sassano and his associates were aware of the possibility of electronic surveillance. The affidavit related details of several intercepted conversations related to possible criminal activity, including references to betting, debts, and tribute payments. Several indicated that Sassano was arranging meetings with the individuals who, according to the confidential informants, run Sassano's illegal gambling operation. Other conversations referred to or arranged meetings with Gambino crime family members.

The renewal affidavit included also an analysis of Sassano's home telephone records and pen register, which reflected numerous calls to known bookmakers, loansharks, and Gambino crime family members. In regard to Sassano's car, the affidavit described how law enforcement agents repeatedly had observed Sassano driving in his car with individuals associated with gambling, loansharking, and the Gambino crime family, including acting boss Peter Gotti. At times, Sassano drove with these individuals to or from meetings with larger groups associated with gambling, loansharking, and organized crime.

Although the intercepted conversations, telephone records, and surveillance observations, if considered separately, may not be dispositive of Sassano's guilt, that is not the

applicable standard. Particularly in light of the substantial deference due the issuing judge, the evidence presented in support of the renewal application was sufficient to support the state court's finding of probable case as to the cellular telephone, the home telephone, the car, and the allegedly criminal conversations sought to be intercepted.

### C. Good Faith Exception

Even if probable cause were lacking, the intercepted communications still would escape suppression. If probable cause is found lacking for a warrant, evidence gathered pursuant to the warrant will be suppressed only if: (1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the wiretap order; or (3) the agent's reliance on the warrant was not reasonable.[26] Sassano does not rely on the first or third scenarios, but instead alleges Rauchet was "overzealous in telling his version of facts in this case" and "relied upon blatant speculation and exaggeration."[27] But Sassano points to no specific instances of falsehood or recklessness in either Rauchet affidavit. Instead, he disagrees with Rauchet's conclusions regarding the described evidence. The fact that alternative explanations for the government's evidence may exist, however, does not show that Rauchet was dishonest or reckless so as to override the good faith rule and mandate suppression. Moreover, at oral argument,

---

[26] *United States v. Leon*, 468 U.S. 897, 922-25 (1984). Although *Leon* does not directly address electronic surveillance, numerous courts, including this one, have extended its holding to such circumstances. *See United States v. Bellomo*, 954 F. Supp. 630, 638 (S.D.N.Y. 1997) (citing cases applying *Leon*'s holding to evidence gathered through electronic surveillance).

[27] Sassano Mem. at 20.

Sassano's counsel admitted the good faith exception applies here.

### D. *Alternative Means of Investigation*

Sassano next argues the government failed to demonstrate the inadequacy of alternative investigative means for obtaining the information sought through the wiretaps, and that its applications therefore were insufficient.

In approving a wiretap application, a judge must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous."[28] This is not an insurmountable hurdle. The government must demonstrate only that normal investigative techniques would prove difficult, not that they would be doomed to failure. As the Second Circuit has explained,

> "'[t]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'"[29]

The statute thus does not require "'that any particular investigative procedure be exhausted before

---

[28] 18 U.S.C. §2518(3). The New York statutory requirements track the federal statute. *United States v. Lilla*, 699 F.2d 99, 102 (2d Cir. 1983) ("For practical purposes the federal and New York statutory requirements are the same."); *People v. McGrath*, 46 N.Y.2d 12, 26, 412 N.Y.S.2d 801, 816 (1978) (New York statute was designed to harmonize state eavesdropping warrant standards with federal requirements). Thus this state-authorized warrant is analyzed here under the federal statute. *Lilla*, 699 F.2d at 102 n.3.

[29] *United States v. Torres*, 901 F.2d 205, 231 (2d Cir. 1990), *cert. denied*, 498 U.S. 906 (1990) (quoting *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir. 1979)).

a wiretap be authorized.'"[30] Instead, a "reasoned explanation, grounded in the facts of the case, and which 'squares with common sense, is all that is required.'"[31] Additionally, this Court must afford substantial deference to the issuing judges' determinations that the government has made this showing.[32]

Sassano argues the government's affidavits included boilerplate and failed to show that alternative methods of investigation were insufficient. He points to the government's apparent success with physical surveillance and confidential informants and argues that the affidavits do not explain why these methods were inadequate to investigate Sassano's activities. But Sassano incorrectly assumes that the purpose of the wiretaps was only to obtain evidence of the sort that the government already had succeeded in obtaining through its confidential informants, physical surveillance, and other measures. The wiretaps, in contrast, were sought and authorized in order to allow law enforcement officers to intercept conversations thought necessary to explore matters that the government had not succeeded in investigating through available means. These included the identities of Sassano's supervisors, assistants, employees, and victims, the locations of his gambling wirerooms, and the details as to how his gambling and loansharking activities were carried out. Probable cause showings were made to justify such interceptions. Alternative methods were not

---

[30] *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (quoting *Lilla*, 699 F.2d at 104).

[31] *United States v. Ianniello*, 621 F. Supp. 1455, 1465 (S.D.N.Y. 1985), *aff'd*, 808 F.2d 184 (2d Cir. 1985) (quoting *United States v. Shipp*, 578 F. Supp. 980, 989 (S.D.N.Y. 1984), *aff'd sub nom.*, *United States v. Wilkinson*, 754 F.2d 1427 (2d Cir. 1985), *cert. denied*, 472 U.S. 1019 (1985)).

[32] *See id.*

likely to be productive in such areas. Physical eavesdropping, for example, whether by law enforcement or an informant, can provide access to only one side of a telephone conversation. The wiretaps were necessary so that the investigative aims of the government could be achieved, and no other technique would have sufficed.

Sassano's attack on the form of the governments' affidavits is equally unavailing. The affidavits describe, with specificity, numerous other techniques that the government might have employed, and why those techniques probably would not have been effective. For example, the affidavits of John B. Kantor, Assistant Deputy Attorney General with OCTF, which Sassano does not address, discussed the unsuitability of a grand jury investigation, physical surveillance, witness interviews, telephone record analysis, pen registers, confidential informants, and undercover infiltration. Rauchet's affidavits provide similar explanations. Sassano complains that these explanations for the necessity of wiretaps are boilerplate in organized crime investigations. While that may be true, such a similarity does not render the affidavits' language ineffective. It should come as no surprise that the facts supporting the conclusion that alternative methods would be unavailing often are similar from one organized crime investigation to another.

### E. *Request for* Franks *Hearing*

Finally, Sassano moves for a hearing pursuant to *Franks v. Delaware*[33] in order to challenge the government's alleged misrepresentations in connection with the wiretap applications. Before a defendant can obtain a *Franks* hearing, he or she first must make a substantial preliminary

---

[33] 438 U.S. 154 (1978).

showing that the alleged misrepresentations are due to the affiant's "deliberate falsehood [or] reckless disregard for the truth."[34] In seeking to do so, the defendant cannot rely on a conclusory attack, but must instead make specific allegations, accompanied by an offer of proof such as affidavits or otherwise reliable witness statements.[35] As discussed above, however, Sassano has provided no evidence of any false statement in the government's affidavits, much less made a substantial showing or an offer of proof. Accordingly, he has not met the requirements for a *Franks* hearing.

Sassano's arguments for suppression of the evidence intercepted from his cellular and home telephones and from his car are without merit. His motion is therefore denied in all respects.

### III. Conclusion

Defendants' motions are denied in all respects.

SO ORDERED.

Dated: September 28, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[34] *Id*. at 171-72.

[35] *Id*.