UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

      -against-                                    S1 04 Crim. 0070 (LAK)

SALVATORE SCALA and THOMAS SASSANO,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

> Eric Snyder
> Jonathan S. Kolodner
> Assistant United States Attorneys
> MICHAEL J. GARCIA
> UNITED STATES ATTORNEY
>
> Bruce A. Barket
> THE LAW OFFICES OF BRUCE A. BARKET, P.C.
> *Attorneys for Defendant Salvatore Scala*
>
> Daniel N. Arshack
> *Attorney for Bruce A. Barket*
>
> Ronald Rubenstein
> RUBENSTEIN & COROZZO, LLP
> *Attorneys for Defendant Thomas Sassano*

LEWIS A. KAPLAN, *District Judge.*

        Defendant Salvatore Scala allegedly is a "capo" and defendant Thomas Sassano

a soldier of the Gambino organized crime family. Both are charged in counts 1 and 2 with conspiracy

to commit extortion and with the substantive offense. Scala alone is charged in counts 3 through 6

with tax evasion in that he allegedly failed, among other things, to file income tax returns for the years 1998 through 2001.

Virtually on the eve of trial, the government served a Rule 17(c) subpoena on Bruce Barket, Esq., Scala's attorney in this case as well as in a prior prosecution that resulted in Scala's conviction of extortion in the Eastern District of New York. The subpoena calls for production by Mr. Barket of:

> "Records showing the source, amounts, and forms in which payment was made for legal, investigative and other fees for services provided in connection with [the Eastern District case], and any related proceedings, excluding any privileged Attorney-Client communications."

Mr. Barket moved to quash the subpoena. The Court denied the motion on June 1, 2006. This opinion sets forth its reasoning.

I

Proper resolution of the issues presented requires careful consideration of the facts.

The present indictment, which added Scala as a defendant to this case, was unsealed on March 29, 2005. The government then was represented by Assistant United States Attorney ("AUSA") Joon Kim. The trial was scheduled for January 9, 2006.

On December 30, 2005, the government informed the Court that the Bureau of Prisons ("BOP") medical staff at the Federal Medical Center at which Scala then was incarcerated pursuant to the Eastern District conviction were unwilling to approve Scala's transfer to this district for trial in consequence of a heart problem, so the trial was adjourned. On March 20, 2006, following further evaluation of Scala's health and ability to travel, it was rescheduled for June 12,

2006.

        At some point between March 20 and early May 2006, Mr. Kim evidently left the United States Attorney's Office. He and his colleague, AUSA Christopher Conniff, were replaced by AUSAs Snyder and Kolodner. In reviewing the government's voluminous files, the new AUSAs came across a $750 check written to "cash" by a victim of the alleged extortion ("Victim #2") that bears the note "legal fees" and, on the back, the endorsement of Mr. Barket or his law office.[1] This, they say, caused them, probably after May 10, 2006, to re-interview Victim #2, who told the government that Mr. Barket never had represented him and, moreover, that he had made a number of cash payments to Mr. Barket as well.[2] This in turn led to a re-interview of Victim #1, who told prosecutors that the amount of the extortion payments demanded of him had gone up in 2001, which coincided with Mr. Barket's representation of Scala in the Eastern District case, because Scala needed to pay legal fees.[3]

        Accordingly, the government on May 17, 2006 applied for and obtained the subpoena at issue here. It claims that the evidence it seeks is relevant on two theories. First, payments to Mr. Barket for the benefit of Scala were or, at least, may have been taxable income to Scala in years in respect of which he filed no tax returns and therefore are relevant to the tax evasion counts.[4] Second, it argues that the evidence is relevant to the extortion counts, in substance because it will corroborate

---

[1]
        Tr., May 30, 2006, at 11-12.

[2]
        *Id.* at 12-13.

[3]
        *Id.* at 13; Snyder Aff., May 17, 2006, ¶ 3.

[4]
        *Id.* ¶ 4.

the testimony of an extortion victim, who is expected to testify that amounts of the extortion payments increased in 2001 in order to help pay for Scala's defense in the Eastern District case.[5]

Mr. Barket immediately moved to quash the subpoena, arguing that its enforcement would make him a witness and result in his disqualification as trial counsel for Scala because he is the only person knowledgeable about the records, that it was served too close to trial, that the standard of *United States v. Nixon*[6] was not satisfied, and that enforcement of the subpoena would be unduly burdensome and oppressive.[7]

The Court heard argument on May 19, 2006, during the course of which Mr. Barket admitted that responsive documents exist and described them as follows:

> "There are records of – the records would be responsive to the subpoena concerning virtually everything, except for the source, with an exception or two; actually, two. The records do not indicate the source of the funds. There were – so that there are – and the records would not be self authenticating."[8]

At the conclusion of the hearing, the Court expressed the preliminary sense that the dispute was premature because production of the documents might result in the government dropping the issue, thus eliminating any issue as to Mr. Barket's possibly testifying and possible disqualification. It granted his request, however, for leave to file an additional brief.

On May 26, 2006, additional papers were filed in support of Mr. Barket's motion to

---

[5]

Letter, Eric Snyder, May 19, 2006, at 2.

[6]

418 U.S. 683 (1974).

[7]

Barket Aff., May 18, 2006, *passim*.

[8]

Tr., May 19, 2006, at 6.

quash.  In most respects, they repeated or elaborated upon the previous arguments that the *Nixon* test had not been satisfied and that enforcement of the subpoena would require disqualification of Mr. Barket in contravention of Scala's Sixth Amendment right.  But the new memorandum  added one significant new assertion, stating:

> "The Government has recently informed Mr. Barket that they are in possession of a check made payable to him, ostensibly for Mr. Scala's legal fees, and issued by one of Mr. Scala's alleged extortion victims.  Based on this, and the Government's suggestion that they are seeking additional evidence of crime in Mr. Barket's possession.  [*Sic*]  Mr. Barket relies upon the Fifth Amendment for his refusal to respond to the subpoena and his anticipatory refusal to testify if called to do so concerning the materials at issue unless the Government provides immunity pursuant to 18 U.S.C. 6002."[9]

This assertion prompted the government to argue that Mr. Barket's invocation of the privilege against self-incrimination demonstrated the existence of an actual, non-waivable conflict of interest between him and Scala and to suggest that Mr. Barket be disqualified.

The Court heard further argument on May 30, 2006.  It concluded that Mr. Barket's invocation of the Fifth Amendment in an effort to avoid compliance with the subpoena created at least a potential conflict of interest between him and his client.  It therefore began a *Curcio* hearing to ascertain Scala's position with respect to whether he wished to waive any claim that Mr. Barket was conflicted with respect to the issue of whether the subpoena should be enforced, appointed independent counsel to consult with Scala on the issue, and recessed the proceedings to enable that consultation to take place.  It did so subject to the possibility that the alleged conflict might prove

---

[9] Additional brief in support of motion to quash and application for a stay to pursue an emergency appeal ("Additional Brief"), at 20.

to be unwaivable, in which event any waiver by Scala would be ineffectual to prevent disqualification of Mr. Barket.

The *Curcio* hearing resumed on June 1, 2006 with Scala previously having consulted with an independent, court-appointed attorney and with that attorney present. It quickly became apparent that Scala, for a variety of reasons, was unable to explain the actual or potential conflict that had led to the hearing, thus raising substantial doubts as to his ability to waive even a potential conflict. The Court then turned to the motion to quash, denying the motion with the promise of this opinion. Mr. Barket thereupon invoked his privilege against self-incrimination in an effort to avoid compliance. The government disputes the validity of that invocation and has moved to disqualify Mr. Barket. Those matters now are being briefed.

## II.

*A.     The Propriety of the Subpoena*

The first question raised by Scala's motion is whether the subpoena should be quashed under FED. R. CRIM. P. 17(c), even putting aside any question as to whether its enforcement would or might force disqualification of Mr. Barket or interfere improperly with Scala's right to counsel.

The rule provides in relevant part:

**"(c)     Producing Documents and Objects**

    **"(1)     In General.**     A subpoena may order the witness to produce any books, papers documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

> **"(2)    Quashing or Modifying the Subpoena.**    On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."

On the face of it, therefore, the rule seemed to pose two questions with respect to this subpoena: whether it should have been quashed as "unreasonable or oppressive" and, if not, whether the court should have directed Mr. Barket to produce the designated items prior to trial.  The parties, however, largely have ignored the latter point, as Mr. Barket's principal interest is in avoiding production either before or at the trial.  They focused principally on whether the subpoena should be quashed independent of when it might be returnable.

Scala argues that *United States v. Nixon* supplies the controlling standard.  The Supreme Court there stated:

> "[I]n order to require the production prior to trial, the moving party must show:  (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'"[10]

*Nixon* of course applies here, as this subpoena seeks production in advance of trial.  But so much of *Nixon* as focuses on the need for production in advance of trial – as distinguished from whether the subpoena should be enforced even at trial – is readily satisfied.  If the subpoena were enforced at all, the government would need time to analyze any documents produced and conduct further investigation, activities that would interrupt the trial if production were first made once trial began.  Thus, if production ever would be appropriate, production in advance of trial

---

[10]    418 U.S. at 699-700 (footnote omitted).

would be the prudent course. The crux of the matter therefore was whether enforcement of the subpoena would have been burdensome and oppressive – a question as to which those aspects of *Nixon* that do not focus on the timing of production are informative.

Mr. Barket argued first that the material sought is neither relevant nor evidentiary. He contended that proof that Mr. Barket received fees during the time at issue in the indictment would not necessarily establish that the fees paid were taxable income for any of the years in question. He asserted also that proof of the extortion claim does not depend upon a statement by Scala to the victim that Scala needed the money to pay his lawyer, thus making the evidence at issue irrelevant.[11]

To be sure, a trial subpoena is "not intended to provide a means of discovery for criminal cases."[12] But evidence that Scala paid his lawyer, or that someone paid the lawyer for Scala's benefit, in a year in which Scala filed no tax return – while far from conclusive – would be relevant. Evidence of such payments would have a "tendency to make the existence of [a] fact that is of consequence to the determination of the action," here the existence of taxable income in a relevant year, "more probable . . . than it would be without the evidence."[13] And surely proof that an extortion victim paid Mr. Barket for services rendered to Scala at a time when the victim claims that Scala demanded an increase in payments to cover his legal expenses would be powerful corroboration of the victim's testimony. Thus, Mr. Barket's relevancy objection is unpersuasive.

---

[11] There was no serious basis for concluding that the subpoena is insufficiently specific.

[12] *Id.* at 698.

[13] FED. R. EVID. 401.

Mr. Barket next contended that the government would have sought the evidence much earlier had it exercised due diligence, thus alluding to *Nixon*'s requirement that evidence sought in advance of trial be otherwise unavailable through the exercise of due diligence. But the argument is wide of the mark.

To begin with, it is far from clear that the government properly may be faulted for first realizing the need for this evidence so recently. While the government had the check months ago, it was in a conference room full of documents, including checks for all sorts of mundane expenses. The possible relevance of this particular check became apparent only when a new AUSA happened to notice that it was endorsed by Mr. Barket and that it bore the legend "legal fees." Even this became significant only when coupled with the results of interviews, during the past three weeks, of two alleged victims. But the question whether the government might have come upon this line of inquiry earlier ultimately proved unimportant.

The question posed by *Nixon* is whether the documents sought were "otherwise procurable reasonably in advance of trial by exercise of due diligence."[14] There is no suggestion that the records of Mr. Barket's fee receipts in respect of his representation of Scala could have been obtained from any source other than Mr. Barket. Nor is there any reason to suppose that Mr. Barket would have produced them if only they had been requested sooner. Indeed, given his assertion of the Fifth Amendment to avoid production pursuant to the subpoena, it seems quite clear that the question whether the government might have sought the documents from him earlier is academic.

---

[14] 418 U.S. at 699.

Next, Mr. Barket relied upon *Nixon's* statement that pretrial enforcement of a subpoena is appropriate only if "the party [seeking enforcement] cannot properly prepare for trial without such production and inspection in advance of trial."[15] He argued that the government was prepared for trial in January and that it therefore is prepared now, even without this evidence. But this argument failed for two reasons.

To begin with, the statement upon which Mr. Barket relied is taken out of context. The full text says that pretrial enforcement is appropriate only if "the party [seeking enforcement] cannot properly prepare for trial without such production and inspection in advance of trial and . . . the failure to obtain such inspection may tend unreasonably to delay the trial."[16] When the full statement is considered, one quickly concludes that the issue the Supreme Court there addressed was not whether a party could go to trial without the evidence, the spin that Mr. Barket would have placed upon it, but whether pretrial enforcement is appropriate in order to avoid unreasonable delay in the trial. In other words, the language relied upon goes to the timing of production, not to the enforceability of the subpoena *vel non.*

More important, Mr. Barket's argument confused the trees with the forest. Even if one were to grant, *arguendo,* that the language upon which Mr. Barket relied bears on enforceability *vel non,* the fact remains that the issue is whether the government would be prepared "properly" absent enforcement of the subpoena. There is a powerful public interest in the trial jury having all relevant evidence in order to determine whether Scala has committed the serious crimes with which

---

[15]     *Id.*

[16]     *Id.*

he is charged. The fact that another AUSA announced that he was ready for trial without having been aware of this evidence did not establish that the government now is prepared "properly" without it.

Finally, Mr. Barket appeared belatedly to argue also that the subpoenaed documents are protected by the attorney-client privilege.[17] But "disclosure of fee information . . . is not privileged even though it might incriminate the client."[18] The suggestion that the issuance of the subpoena to defense counsel on the eve of trial is a special circumstance warranting a different result is without merit. The information either is privileged or it is not, without regard to the timing of the subpoena.

## II

Mr. Barket next argued that enforcement of the subpoena would abrogate Scala's Sixth Amendment rights to counsel and to counsel of his choice. The argument, however, presupposed that enforcement of the subpoena necessarily would require disqualification of Mr. Barket and that he would not otherwise be disqualified.

To begin with, the assertion that Mr. Barket would invoke the privilege against self-incrimination if the subpoena were enforced – an assertion borne out by events immediately after denial of the motion to quash – suggested that he has concerns regarding criminal exposure, most

---

[17] Additional brief at 9-10.

[18] *United States v. Goldberger & Dubin, P.C.,* 935 F.2d 501, 505 (2d Cir. 1991).

likely in connection with his receipt of legal fees on behalf of Scala. That concern would have existed regardless of whether the subpoena were quashed, as the government's potential interest in Mr. Barket would not depend upon the enforcement of the subpoena in the *Scala* case. Thus, Mr. Barket's threatened (and later actual) resort to the Fifth Amendment created at least a potential conflict between Mr. Barket and Scala in light of the possibility that Mr. Barket, if he continued in the case, would conduct the defense with an eye toward protecting himself, perhaps at Scala's expense. In other words, the most serious threat to Mr. Barket's ability to continue his representation of Scala became Mr. Barket's invocation of the Fifth Amendment, not the risk that he would become a witness in Scala's case if the subpoena were enforced. To put it another way, whatever validity there originally may have been in the argument that the enforcement of the subpoena improperly would deprive Scala of counsel of his choice by making his lawyer a witness became academic, or at least probably so, as soon as Mr. Barket threatened to invoke the Fifth Amendment because that threat manifested at least a potential conflict of interest between Mr. Barket and Scala. That conflict may have come to light due to the subpoena controversy, but it exists independent of it.

Even if Mr. Barket's Fifth Amendment claim does not require his disqualification, it is not at all clear that enforcement of the subpoena and any consequent disqualification of Mr. Barket as a witness would contravene Scala's Sixth Amendment right. While an accused has a constitutional right to counsel of his choice, the right to insist upon a specific attorney is qualified.[19] It may well be that Scala's right to insist upon Mr. Barket is trumped by the public interest in

---

[19] *See, e.g., United States v. Wheat*, 486 U.S. 153, 159 (1988).

obtaining all available evidence in order to ensure a just and accurate resolution of the charges against Scala.

In sum, Mr. Barket may be disqualified as a result of his own invocation of the Fifth Amendment. Even if he is not disqualified, the government, assuming it obtains the documents, may decide not to use them or find a way to use them without making Mr. Barket a witness. As long as these possibilities, and perhaps others, remain open, speculation as to what might occur if the motion to quash were denied provided no justification for granting that motion.

III

Accordingly, Scala's motion to quash the subpoena was denied.

SO ORDERED.

Dated: June 2, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)